3230457 in re estate of Ellen June O'Connor, deceased. Thomas J. O'Connor and Kimberly O'Connor appellants versus Dennis J. O'Connor and Terrence F. O'Connor appellees. Mr. Marin, are you ready to proceed? I am, Justice. Thank you. Thank you. My name is Daniel Marin. I represent Tom O'Connor, Kimberly Slick, who are the petitioners in this. It's an extensive will and trust contest case that we filed in Will County in 2017. The matter that's before the court is the entry of a partial summary judgment that was granted by Judge Zalazo at the trial court level, determining that our cause of action relating to the earliest known estate planning documents signed by Ellen June O'Connor, which were a 2000 trust and a 2001 will, we could not show, we didn't articulate a genuine issue of fact as to there being a fiduciary relationship between Dennis O'Connor and his brother Terry O'Connor, primarily Dennis, and their mother, Ellen June O'Connor. Ellen had five children, and my clients represent two of the lines of those children. There's another line, Maureen Hicks, and then Dennis and Terry O'Connor. So it's our burden to show that there was a genuine issue of material fact on the issue of the existence of a fiduciary relationship standing between, essentially, Dennis O'Connor and his mother at the time that she signed the 2000 trust and the 2001 will. Under the case law, bearing in mind that we have to make an arguable showing on each element of a fiduciary relationship, not a persuasive showing, just we have to bring evidence on each point so that we generate a genuine issue of material fact. Testamentary capacity not being one of the elements of this cause of action, we have to show that the factors are the degree of kinship, the disparity of age, disparity of health, mental condition, and the extent to which the subservient party entrusted the handling of her business and financial affairs to the dominant party, and Ellen was the subservient party. Anybody who reads the testimony, and primarily the basis for our position in this case, is that Dennis O'Connor's own testimony and two different depositions that he gave and the records before the court generate that issue of material fact on each element. Anyone who reads Dennis's testimony with any degree of open-mindedness will see that based upon his intimate involvement with Ellen O'Connor's farming and her business affairs, it's at least arguable that he stood in a fiduciary relationship with respect to his mother at the times that these documents were signed, the earliest estate planning documents that we're aware of. There were later ones which were not the subject of summary judgment, but it also helps to consider Dennis's testimony about how it was he was asked the question how it was that he and his brother became the sole beneficiaries of their mother's estate plan, and he testified that you know we had a feeling there was, to back up a little bit, there are two, there's Ellen O'Connor and she had one sibling whose name was Laverne Morgan, and Laverne Morgan was a farmer that lived nearby in Elwood, and he didn't have any, he was a bachelor farmer and no children, so it was believed that his estate plan would favor the five children of Ellen O'Connor, and Dennis testified that we had a feeling that Uncle Laverne was going to cut us out, he was going to, he was going to write us off, and he, but when he was asked how it was that he and his brother ended up being the sole beneficiaries, it's his, it was his testimony that when everyone else had cut her loose, meaning they moved away and got married, he and Terry stayed with their mother, and at one point in 1992 there was a threat of a foreclosure upon Ellen O'Connor's farm, and Dennis stepped in and thwarted that, and he said, you know, I don't care if it's Steve Brockman, who was Deborah Brockman's, Kimberly Slick's mother, Steve Brockman and Deborah made a proposal to buy out the parcel of property that Tyler Grain Elevator was going to foreclose on in Ellen's farmland, and they avoided that. Dennis intervened to avoid Brockman purchasing her, the acreage involved, and Dennis testified, you know, I don't care if it's Brockman or anyone else buying her farm, we were not going to let that happen, and that was his explanation for how it was that he and his brother Terry became the, you know, ultimately were the sole beneficiaries of Ellen's estate, but to show what happened in regard to and why it is that a fiduciary relationship arguably existed in 2000 and 2001, we are able under this record to go back to 1992 and even earlier than that. Dennis O'Connor had moved back home from living away for five years, but he moved back home in 1984. Terry O'Connor moved back in the early 1990s, so they were both living with their mother during most of, Dennis was living with his mother during all of the pertinent periods of time, and in 1992, Tyler Grain, as I mentioned, had threatened foreclosure upon a certain 45 acres of her farmland, and as I mentioned, Steve Brockman and his wife Deborah intervened to make a proposal that they would purchase out her, the acreage involved, and thereby bail her out and let her keep the rest of her farm, and that portion of her farm would be owned by them, and Dennis, there was a meeting at Steve Brockman's house, and the record shows that right after that meeting, there was going to be a trip over to Ellen O'Connor's home in Elwood, and she, they drove there, Dennis got there first, and he spoke to his mother, and as a result of speaking to his mother, she said, my farm's not for sale, so Dennis took it upon himself to find a white knight to come in, and he found his longtime friend from grade school and high school, a guy named Gerald Gerard, and Gerald Gerard was a janitor in the city of Joliet, but he had just inherited property from his mother, who died in 1991, so the bottom line is, Gerald Gerard was able to lend $115,000 to Ellen O'Connor, and she paid off Tyler Grain Elevator. Well, a lot happened after that, so they, she did not lose her farm, she was now indebted to Dennis's friend, and, but after that, Dennis quit his job. He testified that he, he said, after all that had Tyler Grain, I couldn't hold a job and also keep a full-time job, I couldn't hold a job and also take full-time care of my mother, so I, I just stopped working, dedicated my life to taking care of my mother. What was the last year, Mr. Marin, what was the last year that he reported any income, taxable income? He testified that it was probably in 1994, and then it wasn't until 2007, which is after all the events that are before this court at this point, and so he, you know, stopped working. He had, he had obtained a real estate license in 1977, and he considered himself a bit of an expert in real estate in terms of valuing and, and determining what's good real estate and what's not, so he dedicated his life to taking care of her, and his duties were at the properties for no compensation, and he didn't have to pay any expenses, so he and Terry, once he moved back, were basically relying on their mother to pay for everything that they, you know, all of their day-to-day expenses. Terry continued to work, so he was also contributing some towards the household, but not Dennis, so in 1992, you know, does the record suggest the quote-unquote management of rental properties, the significance of that in terms of any kind of timing, time involvement, or? It's, it, there was, the record does not really go into detail about that. It's, the testimony was that Dennis... I mean, you're, you're, you're implicit in, in some of your argument is that, that that may not have amounted to very much, but do we have any basis to assume one way or the other as it relates to that? Well, we do know that the, the property in question was a house that was on Hough Road, so Ellen O'Connor owned her, the property that her farm, her, her own residence sits on, which is, I think, about 115 acres, and then there was 80 acres on Hough Road, which she owned. There was 160 acres on Hough Road, which she was held undivided between herself and her brother, Laverne Morgan, until the year 2000 when it was partitioned and sold, and so the house that was being rented on Hough Road was on Ellen's portion of that property, and he collected the rents on that and sought to the upkeep of that property, so there's not a ton about how much involvement there was there, but... So, the Tyler Green elevator controversy became an obsession of Dennis, and immediately before, before, as soon as they learned that this foreclosure was threatened, Dennis took his mother to the attorney, Thomas Carey, and met with him between April and June of 1992, had eight different communications by fax, by phone, by personal appearances at the lawyer's office, and, you know, he and Carey dealt with him, and Terry was there too. Terry was also at these meetings along with Ellen, so they were just looking into what legal remedies they might have to avoid what would happen with the foreclosure. That stopped in June of 1992. By November of 1992, Gerald Girard had provided the money to defray this, or to avoid this foreclosure. In 1991, Dennis and Terry had formed a corporation called DTO Group Inc., and DTO stands for Dennis and Terry O'Connor. Dennis insisted, or testified, that his mother was involved in this, in this company, but Terry, in his own deposition, testified that his mother was not involved at all. It was Dennis, and it was Terry, and it was O'Connor, and they were going to sell real estate out of this company. In 1993, Ellen sold 10 acres at the north end of her property in Elwood, and then, in the next year, purchased 20 acres to the immediate east of her property, and somehow this, and we asked Dennis to explain it in his deposition, and somehow this property ended up, even though Ellen had purchased the property, it ended up in this DTO Group Inc. entity, and ultimately was sold in 2007, along with a lot of Ellen's other farmland, to the ultimate purchaser of all of the real estate for, you know, $1.1 million, just that 20 acres, and Ellen did not get any of that. She was not a shareholder in DTO Group. Mr. Marin, at the time that the grant, the deed was issued, was the deed, it was the grantee, the mother, or was it the corporation? Are you talking about in regard to the DTO Group? Yes. You said that she ended up not receiving any of this. How was the title transferred when she sold those 10 acres? Well, she sold the 10 acres. We're not sure what happened with the on the sale of the 10 acres to the north, the purchase of the 20 acres to the east. All we know from Dennis's testimony is that she purchased it, and then DTO came to own it, and there's no testimony or other evidence regarding consideration exchange between the two. Anyway, I see that I'm a little getting close to the end here, and what I wanted to point out was in each of the years of the 1990s, there are major events that take place, including Dennis sending off an ARDC letter to the attorney representing Tyler Grain Elevator, whereby he secretly records conversations, and Terry's involved in that too. I should say he and Terry secretly recorded a conversation between Deborah Brockman in 1992 and Terry, where they're screening their mother's calls. In 1985, the same thing happens with regard to this ARDC situation, and Dennis types up a letter in the first-person narrative from Ellen's point of view and sends it off with her signature, complaining about Joseph Treiner. Mr. Maron, quite a bit of your brief deals with issues, timing that happened after the trust in 2000 and the will in 2001. Do you have any authority to support your argument that this court can look to transactions that happened after, that postdate the relevant portions to establish a fiduciary, in fact, relationship? Any authority? Well, I mean, the timing of what happens after the 2001 will, I mean, it's all essentially simultaneous. So, if you look at what happened in 2000 and 2001, these are happening simultaneous with John Ridge's preparation of the trust and of his preparation of a will, of Dennis' execution or his putting his own name on the deeds and having them mailed back to him, signing exemption certificates, meets and bounds affidavits involved in all these transfers. So, I'm not asking the court to make a leap of events taking place years later. I'm talking about things that happened then, and I'm talking in our posture of the case and what we laid out from 1991 through the year 2000. There's all these events that lead up to the signing of the 2000 trust and the signing of the 2001 will, including the fact that Dennis himself had located the attorney, John Ridge, who did the tie walk litigation in Will County in 1999, and at the same time was doing the will and the trust for Ellen O'Connor. Thank you. Thank you. I see I'm out of time. Any additional questions from Justice Albrecht? No. All right. Thank you, Mr. Mayor. You'll have an opportunity in rebuttal. Mr. Novak. Thank you. Good afternoon, Justices. May it please the court. My name is Steve Novak, and I represent the respondent at Belize, in this case Dennis O'Connor and Terry O'Connor. Justices, we submit that the trial court did not err in entering a summary judgment in favor of the respondents on counts 10 and 11 of the petitioner's amended petition. The trial court properly entered summary judgment in favor of the respondents since essentially the pleadings, the depositions, admissions, and affidavit on file failed to present a genuine issue of material fact that either Dennis or Terry stood in a fiduciary, in fact, relationship with their mother at the time the 2000 trust and 2001 will were executed. Counts 10 and 11 had one cause of action that essentially mirrored each other, and that was a breach of fiduciary duty. And obviously, an essential element of that cause of action is the existence of the fiduciary relationship. And I believe it's instructive, you know, the cases that were originally cited by petitioner, the Jarmuth and the Heilman cases, which were then kind of backed off on in the reply brief, essentially lay out facts, evidence that established this general fiduciary, in fact, relationship. Again, it's, I think it's important that the evidence needs to, you know, there must be some evidence that this fiduciary, in fact, relationship existed at the time that the 2000 trust and 2001 will were executed. And the context, the context of all this is the petitioner's testimony that during this time period, you know, there was essentially their mother, you know, was mentally sharp. She was mentally competent. There were no issues with her memory. The purported subservient party, their health and mental condition is one of the essential elements as to the finding of a fiduciary, in fact, relationship. I understand that, you know, testamentary capacity isn't, you know, one of the, I guess, bases that they're seeking to set aside the 2000 trust and 2001 will, but that is one of the essential factors. And it was the petitioner's testimony that there were no issues whatsoever with Ellen's mental capacity during this time period, that Jarmuth and Heilman case, you know, present situations where the alleged subservient party was suffering from issues with their capacity. And because of those issues needed to repose special trust and confidence, needed to rely on the alleged dominant party for aspects of their everyday life, of their everyday care. Essentially, what the petitioner has also testified to is that Ellen was not receiving any special assistance with her activities of daily living during this time period. She was not receiving any assistance with her finances during this time period. She did her own banking. She wrote her own checks. And so, the facts that are outlined in those cases, again, Heilman and Jarmuth are completely contradicted by the petitioner's own testimony. So, that's the backdrop. That's what was going on overall in 2000 and 2001. So, now what the petitioners have done is they've essentially cobbled together any type of occurrence, any type of instance where Dennis was dealing with something related to his mother touching on any type of business affair or legal matter. And we heard a lot about single conversations, single meetings with attorneys that occurred in 1992, almost eight to nine years prior to the operative documents. We heard about ARDC complaint in 1995, which is five to six years prior to the operative documents. And then, I think then it was 2007, which is, as Justice Davenport pointed out, I'm not aware of any authority whatsoever that this court, like the trial court, is able to take into account events that happened years later than the operative documents in this particular appeal in order to consider whether there's evidence of a fiduciary in fact relationship. Mr. Novak, does Dennis's involvement in that ARDC complaint not weigh in favor of a finding of fiduciary in fact? The fact that his mother, he was handling this for his mother or not? I don't believe so, Judge. And I think what was also, you know, adduced from the record and also adduced from the argument today is that this became Dennis's issue. And Dennis is, you know, Dennis is the one that did file the ARDC complaint. He is the one that, you know, signed some other documents related to this tie walk lawsuit, again, in 1992 and 1995. And there is nothing in the record that supports, that essentially ties Dennis's conduct to his mother. And as far as she was the one relying on Dennis to do all this for her, and this wasn't in fact Dennis's issue and Dennis's crusade with respect to the tie walk litigation. Do you believe now that Dennis's actions can be imputed to his brother, Terry, you think or not? I mean, I do think the Swenson case supports that in certain situations, a breach of fiduciary duty that benefits somebody can be essentially imputed to them. I do believe that that, you know, that case does say that. But I do think it's also important to note that Terry, you know, Terry is, you know, at the start of the argument, it's Dennis and Terry, and then it quickly becomes just Dennis. And Terry essentially falls off from all of this. Dennis also, I think counsel say in his argument is that, and this is the way, you know, I view it, is that once Dennis moved in with his mother, it's Dennis that's relying on Ellen and not the other way around. Dennis didn't have a job. There's nothing in the record other than this conclusory statement by Dennis that he devoted his life to his mother. There's nothing else in the record as far as what that meant, particularly when it comes to her affairs on a day-to-day basis, her affairs, you know, either whether it's with her care, whether it's with her business. I know there was a statement regarding rental properties. And as I sit here, I still don't really know what Dennis exactly did with respect to the rental properties. And I know that that statement was just by him and his deposition, but there's nothing else in the record to describe what that meant or what was involved with that. And so essentially, you know, I just wanted to go back to, again, you know, there's a couple other attorneys that are mentioned in petitioner's briefing. You know, one is, there's a single meeting in 1996 with the Vincent Portlock. And again, these one-off meetings, these one-off, you know, discussions with attorneys, and purely as it relates to this TIWOC lawsuit, we're all, you know, we're focused on that essentially when it comes to a finding of or the lack of a finding of a fiduciary in fact relationship. And just to go back to those cases, it's a showing that needs to be made that it was operating at the time that the documents were executed. So it's a position of dominance. It's a position of trust and confidence that can be shown generally based on, you know, the evidence that's presented. And it's instructive in those cases that it's these general types of things which are constantly operating. You know, the alleged subservient parties in those cases, it's they needed assistance on a near daily basis. They needed assistance regularly during the entire operative time period. You know, it's not situations where, you know, assistance here or there may have been provided, you know, years before or years later. It's a general state of affairs essentially where the alleged dominant party is providing this assistance on a regular basis. So, and essentially, you know, the petitioners laid out in their own testimony that that just was not the case. Everything else pretty much comes from Dennis's, you know, his testimony. There's nothing else in the record as far as assistance or anything else that he may have provided to his mother on a regular basis. Justices, so for those reasons, unless you have any other questions, I might ask the court to affirm the judgment of the trial court and its of summary judgment on counts 10 and 11. Justice Davenport? No further questions. Justice Albrecht? No questions. Thank you, Mr. Novak. Mr. Marin? Thank you. Knowing that I don't have much time here on rebuttal, I would just say- May I just ask a question? Sure. I recognize that this is not a capacity case. Correct. But when we look at the fiduciary in fact case law and all the things that they want us to think about, would it be fair to say that diminished testamentary capacity is kind of significant to those cases that found fiduciary in fact? It can be. It certainly can be if the facts are there. But the Jaramuth case, the Heilman case, the Swenson case, even the Hoover case from 1993, all make it very clear. The Supreme Court reversed the appellate court in Hoover to say, there was a mistake made here. Testamentary capacity is not an element of undue influence. You can have capacity and at the same time be under someone's undue influence. They made that quite clear. And in this case, this is a very good case that shows somebody who can- who is- Ellen O'Connor, I think, given everything involved, all the facts involved here, was a pleasant person who liked to visit with her family. And Dennis O'Connor was a domineering, very, you know, alpha figure and lived at home and governed that home, took control of everything involved in that home. And we pointed out, virtually every year in the 1990s leading up to, and then the whole point of it is to lead up to, this was the situation in the year 2000 when a trust which favors Dennis and Terrence heavily was signed. And within two years, they were the owners of 34 acres of Ellen's real estate outright because their father, Frank, had died. And this attorney who Dennis had found was the attorney who put this together. He did the 2001 will, again, at least $30,000 among the three people who are not named Dennis or Terry. It misspells the names of two of them. And that's right. It leaves- it uses the maiden names of two of them. And when they had been known for decades by their married names, and it leaves everything else to Dennis and Terry. I also wanted to bring up testamentary capacity is not an element here. You can have testamentary capacity if you are a pleasant person who likes to go along and get along, and you are living with someone who is a domineering influence. Then you can be unduly influenced to do things that you otherwise would not do. And I realized, and again, our burden is not to persuade at this point, it's to show evidence of each element of the reliance and the dependence and the domination. And I think we have a very strong case. It leads up to the year 2000. And Justice Davenport, you were mentioning, is there any case law? Well, there is. We didn't mention it in the briefs, but there is case law that talks about, generally speaking, the rule of thumb is two years before and two years after is a fair period of time to do it. We didn't quote that in our brief, but there is case law to that effect. But we didn't really go beyond. When Steve talks about going into the later events, where there's all kinds of transfers and Dennis and Terry end up with all of Ellen's assets, all of them, during her lifetime, not just at her death. We're not relying on that. We're not saying that that, but we are saying that the 2000 trust and the 2001 will were just the start of what happened later. And so that's essentially how our brief should be read and how this case should be interpreted. And we respectfully ask the court to see this as we don't have to persuade. We have to present a genuine issue of material fact. And we think we did that. Thank you. Are there any questions from either the panelists? No. No. All right. We thank both sides for a spirited argument. Matter will be taken under advisement and a decision will render in due course.